# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DAVID HONORE** | **CIVIL ACTION** |
| **VERSUS** | **NO. 06-5968** |
| **N. BURL CAIN, WARDEN** | **SECTION "N" (6)** |

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.

Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2). Accordingly, it is recommended that the petition be **DENIED WITH PREJUDICE.**

# I.  PROCEDURAL HISTORY[1]

Petitioner, David Honore, is a prisoner presently incarcerated in the Louisiana State Penitentiary, located in Angola, Louisiana.  On December 8, 1999, petitioner, along with co-defendant, Uralle Price, was charged by grand jury indictment with the first degree murder of Rickey Thomas, in violation of La. R.S. 14:30.  Both pleaded not guilty at their January 5, 2000 arraignment.  On January 31, 2000, following a sanity hearing, the trial court found defendant Honore in need of psychiatric treatment.  The State amended the indictment on March 28, 2000 to charge both defendants with second degree murder.  On April 10, 2000, following a second sanity hearing, the trial court determined that defendant Honore continued to need psychiatric treatment.  On May 1, 2000, following a third sanity hearing, defendant Honore was found competent to proceed.  On that same date both defendants pleaded not guilty to the amended indictment.  On December 18, 2000, at the conclusion of a four-day trial, a twelve-person jury found both defendants guilty as charged in the Thirty-Fourth Judicial District Court for the Parish of St. Bernard, State of Louisiana.  On August 7, 2001, the trial court denied defendants' respective motions for new trial.  Defendants waived all legal delays and were each sentenced to life imprisonment at hard labor, without benefit of parole or probation. On April 2, 2003, the Louisiana Fourth Circuit Court of Appeal affirmed both defendants' convictions and sentences.  *State v. Price*, 842 So.2d 491

---

[1]A portion of the procedural history was taken from the Louisiana Fourth Circuit Court of Appeal's decision, *State v. Price,* 842 So.2d 491, 495 (La. App. 4 Cir. 2003).

(La. App. 4 Cir. 2003). On November 21, 2003, the Louisiana Supreme Court denied petitioner's writ application, thereby rendering his conviction and sentence final. *State v. Honore*, 860 So.2d 542 (La. 2003).

On June 29, 2004, petitioner filed with the state district court an application for post-conviction relief. Petitioner's efforts in this regard culminated on February 10, 2006, when the Louisiana Supreme Court denied his writ application. *State ex rel. Honore v. State*, 924 So.2d 156 (La. 2006).

On September 6, 2006, petitioner signed the instant federal habeas corpus action, arguing: 1) The evidence was insufficient to prove that the defendants were the perpetrators of the crime; 2) The trial court erred in refusing to admit Felicia Varnado's inconsistent statements into evidence; 3) The trial court erred in providing an "incomplete re-instruction" to the jury with respect to reasonable doubt;[2] 4) The trial court erred in admitting evidence regarding Honore's character and alleged suicide attempts without conducting a pre-trial hearing; 5) The State failed to disclose the fact that it had performed tests on Varnado's vehicle which revealed no fingerprints matching either of the defendants' fingerprints and the trial court erred in failing to grant defendants a new trial based upon this

---

[2]Claims 2) and 3), as set forth in this Report and Recommendation, are encompassed in Honore's "Claim No: 1".

undisclosed exculpatory evidence;[3] 6) He received ineffective assistance of counsel; and, 7) The State's attorney at trial was guilty of prosecutorial misconduct. The State, in its response (rec. doc. 7), does not contend that petitioner has failed to exhaust his state court remedies as required under *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982), and concedes that the instant action is timely. Accordingly, this court shall proceed to address the merits of petitioner's claims following a review of the facts and the court's standard of review.

## III. FACTS[4]

Felicia Varnado, twenty-one years old at the time of trial, testified that she had known defendant Uralle "Tully" Price since she was six or seven years old, from the lower Ninth Ward neighborhood where she used to live. She went to elementary and high school with him. Varnado also knew defendant David Honore from the neighborhood, and had dated him for six and one-half years. Rickey Thomas, the victim, was her boyfriend at the time he was murdered. Varnado replied in the negative when asked whether she had any reason to testify falsely against either defendant. Varnado stated that defendant Honore knew she dated the victim. Honore kept trying to get her to resume their relationship. He later

---

[3]Claim 5), as set forth in this Report and Recommendation, encompasses Honore's "Claim No: 3" and "Claim No: 6".

[4]The facts are taken from the Louisiana Fourth Circuit's opinion on direct appeal, *Price*, 842 So.2d at 495-505.

threatened her, saying that he would kill himself, kill her and kill Rickey Thomas. Varnado drove a red Dodge/Plymouth Neon, which she identified in photographs. On November 10, 1999, at approximately 7:30 or 8:00 p.m., she took some food to Rickey Thomas at the post office, where he worked. She talked to him later on the telephone, and picked him up when he got off work. She had her cousin in the car. She took Rickey Thomas home, dropped her cousin off, then went home herself.

Varnado talked to Thomas on the telephone for up to an hour, and then went to Wal-Mart. She arrived back at her home, located at Caffin Avenue and Dauphine Street, gathered her bags, and started to exit her car. Defendants Honore and Price suddenly appeared, with guns. Honore was calling her bi* * * and telling her to get the f* * * over as she screamed and hollered. Price cocked his shotgun, called her b* * * *, and told her to shut up. She confirmed that they had masks on, and were attempting to disguise their voices. They told her they wanted the dope and the money from her boyfriend. She offered them $600 her cousin had just repaid her for school related expenses, and her jewelry. Price slapped the money away. They drove her to the river and got out and talked. Price was saying just kill the b* * * *. They forced her to show them exactly where Rickey Thomas lived.

Varnado said that when they got to the victim's apartment, Price's "towel" had fallen below his nose and she could see that it was in fact Price. She said there is no doubt

in her mind that it was Uralle "Tully" Price.  Varnado said Price had rubbed stuff in her eyes while at the river, and at the apartment he rubbed pepper spray in her eyes. Honore pulled her out of the car, put his pistol in her back, forced her up the stairs of the victim's apartment complex, and made her knock on the door of the victim's apartment. Honore spoke in his regular voice at this time, which she recognized.  She said Price did most of the talking, and that when Honore had talked earlier he spoke with an accent.  She never saw Honore's face, but knew it was him because of his voice, his mouth, his build, the way he walked, "everything" about him.

Varnado said the victim opened the door when she knocked on it.  Honore came from behind her and the victim fought with him.  Honore shot the victim in the side and the victim fell to the ground.  Price ran up the stairs and shot the victim "some more" with the shotgun, and Honore shot him after that.  Varnado said she ran downstairs screaming and hollering and knocking on doors.  She ran across the street to the police substation and knocked on the door, then came back and telephoned police.  A male came up and took the telephone from her.  Honore and Price drove off in her car.  Varnado said she had no doubt that Honore shot the victim with a pistol and that Price shot him with a shotgun.  She said the victim had no weapon.  Varnado admitted that when first asked by police she was afraid to tell them who did it.  She denied involvement with drugs, and said she used to be employed by the U.S. Postal Service, where the victim was employed at the time of his death, and that

they had to undergo drug tests. When presented with crime scene photographs, Varnado at first said she could not look at them. The trial court told her she had to, and she did. She identified the photos as depicting the victim and the scene. She said the victim was shot outside of his apartment, and that Honore and Price never attempted to enter it.

Felicia Varnado was shown a high school prom photograph of both defendants and either Michael Tenner or Michael Rhea, who she confirmed were Price's friends. Varnado went to the high school prom with Honore, along with his friends. She agreed that it would not be unusual for Price to be hanging out with Michael Tenner or Michael Rhea. Price once told her that if Honore ever caught her cheating on Honore, Honore would kill her and the person she was cheating with. She thought this happened in 1998. She said Honore and Price once went to a male friend's home looking for Varnado. Varnado was at the house visiting with two other friends, but the male friend told Honore and Price that Varnado was not there. It was after this that Price told her that if Honore had caught her there they would have been "spread" all over the house.

Varnado agreed that it was common for her to see Price in the neighborhood. On the night in question, Varnado first said it was approximately 1:30 p.m. that Honore and Price accosted her as she was attempting to exit her car with her Wal-Mart purchases. She then said it was about 1:00 or 2:00 a.m., but not 3:00 a.m. She also estimated that she was with them for only ten to fifteen minutes. She subsequently said she did not know what time

it was.  Varnado said Honore was wearing a mask; she could see his mouth, but not his eyes.

Price was wearing a dark-colored jacket with a hood tied tight over his head, with a white

towel, like a small washcloth, over his mouth and nose.  It later slipped below the nose, but

still covered the mouth.  She could not see his hair.  Neither one of the defendants referred

to her by name.  Varnado was asked on cross examination if it was fair to say that the only

thing that seemed to be on the minds of the two men was money and dope.  She replied in

the negative, stating that the only thing on their minds was killing Rickey Thomas, because

they would have taken the $600 she offered them if they wanted money.  She conceded that

dope and money were the things they said they wanted.

Varnado said the victim and Honore struggled over the gun that Honore had

out, and Honore shot the victim in the side.  When she ran down the stairs after Price came

up, she was barefooted.  Her shoes came off when Honore removed her from the car.

Varnado said she did not recognize the man who took the telephone from her and talked to

police as someone from the apartment complex.  She agreed that she was hysterical at that

time.  Sgt. McNabb was the only person to whom she told who did it. Varnado was shown

her statement.  The interview began at 6:00 a.m., some two and one-half hours after the time

of the crime, which was listed as occurring at 3:20 a.m.  The interview ended at 7:47 a.m.

Varnado admitted that when Sgt. McNabb asked her if she knew who had been with Honore,

she said she did not know.  She did say that she was not sure, but that she thought it could

have been Honore's friend, Tully. Varnado said she was afraid for her life because they had threatened to kill her. She said that was why she had moved to another state and could not live at home. She conceded that when Sgt. McNabb was concluding the interview and asked her if there was anything she would like to add or delete from the statement, she replied: "I think that's about it."

Felicia Varnado testified on cross-examination by Honore's counsel that Honore carried the shotgun and Price carried a silver revolver. She said that at the point when she was sprayed with what she thought was pepper spray, she had not yet identified the men. She said the person in the back seat sprayed her as they were driving her around. One of the men was driving and the other was in the back seat. They switched places after stopping at the river/levee. She was sprayed after that. Varnado said that when they got to the victim's apartment complex, she turned and saw that the little washcloth on Price had fallen below his nose. That was when she recognized him. She recognized Honore when he came around to get her out of the car. She said she put it all together and realized it was them. She lost one of her sandals when Honore pulled her out of the car. One sandal was left in the car, one was left outside. Varnado did not recall the name of the officer who first showed up on the scene, nor did she recall telling him simply that it was two black suspects. She said that when she gave her statement she said she did not know who it was, although she was thinking it was the defendants. She testified that she then came back and thought about things, and identified the two men as Price and Honore. Varnado was asked about not

saying anything in her statement about recognizing Honore's voice. Varnado replied that there were things she left out because she was upset and in shock. She was confronted with her prior testimony given at another hearing when she stated that she told police that she "thought" it was Price and Honore.

Varnado admitted telling police that she could see Honore's eyes, but meant that she could see through the holes in the mask. However, she said she could not see the eyes well enough to recognize him by his eyes. She said Honore had a distinctive walk, and that she noticed it when they arrived at the victim's apartment complex and Honore exited the car and walked around her. She admitted failing to mention this to Sgt. McNabb when she gave her statement, but said that she was afraid and was still afraid. Varnado knew Honore had lived in Tennessee, and that he had two brothers and three sisters who lived there.

Dave Levy, with the Jefferson Parish Sheriff's Office, processed the homicide scene on November 11, 1999. Levy identified photographs of the scene, and also of 708 Lizardi Street. He took the Lizardi Street photographs at approximately 8:00 a.m., photographing a five-count box of Federal Premium twelve-gauge, three-inch Magnum, "double ought" buckshot shotgun shells. He also photographed a spent shotgun shell of that same brand, gauge, shot size, and length, found in the parking area adjacent to the apartment complex at the homicide scene. Levy photographed two buckshot pellets and two bullets

found underneath the victim's body. He identified those two pellets and two bullets in evidence. Levy found two fingertips from a latex glove on the rear floorboard of a red Dodge Neon.

Dave Levy testified that the shotgun shell box and the interior of the red Dodge Neon were processed for fingerprints in his presence, but that no identifiable prints were found. Levy said a towel or face cloth was recovered from the vehicle. Levy seized a black shoe from the rear seat of the red Dodge Neon. Levy was shown a crime scene photograph of the interior of the victim's apartment, depicting what he said appeared to be a woman's black shoe. He said that according to the crime scene report, this second shoe was not retrieved as evidence.

Dr. Paul McGarry, qualified by stipulation as an expert in the field of forensic pathology, autopsied the victim on November 11, 1999. There were nine gunshot wounds, seven from bullets, two from buckshot (shotgun pellets). The two shotgun wounds would have been fatal, as would have one bullet wound penetrating the heart. A second bullet wound penetrating the lung would have been fatal if not promptly and effectively treated. The cause of death was seven gunshot wounds and two shotgun wounds that caused massive bleeding. Dr. McGarry said he did not know which wound came first, but confirmed that the victim was alive-his heart was still beating-when at least one shotgun and one pistol wound was inflicted in the chest and/or abdomen.

Dr. McGarry said the plastic shotgun-wadding cup was three-fourths of an inch in diameter, which he represented as the size of a twelve-gauge. Two copper jacketed 9mm diameter bullets, and one bullet without a jacket, were recovered during the autopsy. Dr. McGarry said on cross examination that his findings suggested at least two guns were used, a shotgun and a handgun of either a 9mm or .38 caliber. He said those bullets measure so close together that one cannot tell the difference between a 9mm bullet and a .38 caliber bullet. He opined that a ballistics expert could tell whether the bullets were fired from the same gun.

Charles R. Watson Jr., with the Louisiana State Police Crime Lab, was qualified as an expert in the field of fingerprint testing and firearms identification. He examined five 9mm/.38 caliber bullets. Three of them, with copper jackets, were fired from the same gun. Two of the five bullets were unjacketed lead, and were fired from the same gun. He said the widths of the "lands" and "grooves" of the three copper and two unjacketed lead bullets had the same measurements. However, he could not say the jacketed and unjacketed lead bullets were fired from the same gun, but neither could he exclude that possibility. This was because a copper jacketed bullet and a lead bullet react differently. He attempted to but could not lift any fingerprints from the two fingertips from a latex glove or gloves recovered from the red Dodge Neon. Watson was shown a photograph of the victim, and asked to assume that a wound evidencing massive amounts of blood and tissue around

it was caused by a 12-gauge-shotgun blast. Watson conceded that it was within the realm of possibility that blood might have ended up on the perpetrator. However, he said on redirect examination that he would not expect DNA evidence to be on such a perpetrator who took several showers and came back several days later in a different set of clothing.

Ray Poteet lived in the same apartment complex as the victim Rickey Thomas. Poteet lived downstairs, in apartment 105; the victim lived above him, one apartment over, in 206. At approximately 3:00 a.m. on November 11, 1999, Poteet heard three gunshots. He got out of bed, put on his glasses, and peeked out his front window to see two black males run down the stairs and enter a red Dodge Neon. The vehicle pulled forward, then sped backward in a westbound direction. He did not get a good look at their faces. Poteet went upstairs to the victim's apartment to find Felicia Varnado standing by the victim's body, on the telephone, screaming hysterically that they shot her boyfriend and stole her car. Varnado handed Poteet the telephone; the 911 operator was on the line. Poteet recalled asking Varnado if she knew who shot the victim, and she replied in the negative.

Detective John Graf, of the St. Bernard Parish Sheriff's Office, testified that he took photographs of defendant Honore when he surrendered himself on December 8, 1999, in the company of an attorney. Det. Graf took the photographs because Honore had injuries to his neck and cuts on both wrists. Harbor Police found the red Dodge Neon in New Orleans, in the Ninth Ward. Det. Graf went to the scene. He could tell from the road dirt and

circular marks on the vehicle that it had been wiped from the top to three or four inches below the door handle. He went over the car looking for fingerprints, inside and out, but found none, not even those of Felicia Varnado, the owner of the vehicle. No cash or jewelry was found in the red Neon.

St. Bernard Parish Sheriff's Office Detective Sergeant Robert McNabb confirmed on cross-examination that no fingerprints were found on the red Dodge Neon. He also confirmed that when defendant Honore surrendered himself that counsel accompanying him requested in writing that Honore be give a medical examination as soon as possible. The attorney's writing also noted that Honore appeared to be recovering from serious injuries and was in possession of medical supplies. Sgt. McNabb took a taped statement from Felicia Varnado after the murder and typed it up for her signature. During her interview, Varnado often referred to one suspect as the "other guy" or "the guy with the towel." Sgt. McNabb recalled that when asked if she knew the person's name, she replied that she could not be sure, but that it could be "Tully." Sgt. McNabb confirmed that she described Tully as "his friend." Varnado subsequently identified that person, Tully, as defendant Uralle Price, although not in a formal statement.

Sgt. McNabb said a person described as six feet tall or over was seen fleeing the red Dodge Neon at the location where it was later found abandoned. Sgt. McNabb's testimony established that Felicia Varnado identified defendant David Honore as one of the

perpetrators, and that she knew it was him because she had dated him for five years. She recognized his stature, his voice, his eyes and his mouth-he had gold teeth. She also said she knew it was him because he did not hurt her. Varnado said she was taken to the apartment at gunpoint, and was pushed back when a struggle began between defendant Honore and the victim. She ran down the stairs screaming for help as Price came upstairs. As she went down the stairs she heard the first shot. She turned and saw the victim fall. She continued down, hearing more shots, and looked back to see Price fire at least one shot from the shotgun. Varnado said she believed the perpetrator with the shotgun had ejected a shotgun shell in her car, but one was never found there. Varnado stated that some type of spray or mace was wiped in her eyes when her kidnappers drove her to the river. Varnado told Sgt. McNabb that she feared defendants and their families. She attributed discrepancies in her statements to fear for her safety. In interviews subsequent to the first one, Varnado expressed no doubt in her identification of defendants. Sgt. McNabb said Kenneth Cain, Price's uncle, was with Price when he surrendered to police.

Kenneth Cain, defendant Price's uncle, lived one block from Price's Lizardi Street home, where Price lived with his parents. Cain accompanied Price, the son of his sister Linda, when Price surrendered to police. Cain had known defendant Honore for most of Honore's life. Cain said Honore was in Tennessee between November 12, 1999, the day after the murder, and December 1, 1999. Cain admitted two prior felony convictions,

possession of stolen property in 1981 and possession of cocaine in 1990. Cain replied in the negative when asked whether he had seen defendant Honore on November 10 or 11, 1999. He could not say where defendant Price was on the night of November 11, 1999.

Sidney Snow recalled an occasion in November 1999 when he telephoned the Harbor Police about an abandoned, possibly stolen, car in his New Orleans neighborhood. He first stated that the car was a white, full-sized car, but was not positive, noting that it was dark. He could not identify a photograph of the red Dodge Neon as being the car, but said it fit the description and size, and said if the photograph was taken that night it was the car he saw. He heard the car pull up, heard at least two voices, and within seconds saw a person five feet nine to six feet two inches tall run past his residence in an uptown direction.

Martin Honore, defendant David Honore's brother and a resident of Tennessee since 1996, was asked where David was on November 10, 1999. Martin said defendant Honore was in Memphis, working with him cleaning windows on that date. However, Martin subsequently conceded that he did not know the exact date. What he recalled was that he learned from his sister one day in November, 1999 that defendant Honore was wanted by police for something that had happened on the previous day. He knew defendant Honore had been working with him on that day and did not get off work until around 5:30 p.m. Martin could not recall how often he saw defendant Honore during the month of November; he first

said almost daily, but then said every couple of days. Martin thought that defendant Honore had a full-time job, apparently unaware that he had quit that job.

Paul Honore, another of defendant David Honore's brothers, testified that the family had two brothers and three sisters living in Memphis, and that defendant Honore had been living there as of November, 1999. The police in New Orleans came looking for defendant Honore in November, 1999, and Paul told them he was in Memphis. Paul guessed that he had last seen defendant Honore some two months before then. To the best of his knowledge, defendant Honore was in Memphis on the night before police came looking for him, and had been in Tennessee for about nine months prior to that time. He said police found none of defendant Honore's clothes or personal belongings when they searched his parents' Dauphine Street residence. Defendant Honore had no transportation of his own in November 1999. Paul testified on cross-examination that he never talked to defendant Honore or received any letters from him, but assumed he had been living in Memphis.

Lisa Parker, twelve years old at the time of trial, testified that she lived at 1015 Government Street, Apartment 106, underneath the victim's apartment. She was lying in bed when she heard Felicia Varnado cursing and telling Rickey Thomas that he stole her car. Lisa later heard what sounded like men and one woman running up or down the stairs. She looked out of her peephole and saw what looked like two males going up the steps. After that, Lisa said she had heard bumping on the floor, like something hit the floor. Lisa replied

in the negative when asked whether she heard anything else from the apartment, i.e., a gunshot. However, she stated on cross-examination that she heard something that sounded like a car backfiring, approximately four times. Lisa indicated that, in retrospect, the sounds were gunshots. She later saw two men drive off in a red car. Before they did, Lisa said a female she thought was Felicia Varnado unsuccessfully attempted to get inside, but the man on the passenger side kept closing the door on her. Later she was asked if she could tell why Felicia Varnado did not get into the car, Lisa said she guessed it was because she was scared for her life. The female yelled at the men that they stole her car.

Lisa was also asked on cross examination whether anyone had ever asked her to lie, and she replied in the affirmative, naming Price's defense counsel, the very attorney who was then cross-examining her. Lisa started to say that her mother told her that defense counsel did or said something, but was interrupted by defense counsel who asked whether the witness had ever talked to him. Lisa replied in the negative. Under follow up questioning on this issue, Lisa explained that counsel for Price had asked her mother to lie, to say that the two guys she saw running were not black. Lisa said the two men she saw running down the stairs were black. Counsel for Price asked Lisa why she was afraid of him, and she replied that it was because he was a "tall guy." Lisa said her mother did not observe as much of what occurred outside that night as she did, as her mother only briefly looked out of the window.

Linda Williams testified that defendant Uralle "Tully" Price was her son, and that he lived with her at 708 Lizardi Street with her three other sons and her fiancé. Defendant Price and her other sons lived on one side of the double residence. On the day Price was arrested, Williams was called from her nursing job and told that St. Bernard Parish authorities needed to talk to him. She went home and spoke with the authorities. Her brother later took Price home. They contacted defense counsel, and Price surrendered to authorities. She did not see a shotgun shell in front of their home when she left for work on the morning Price was arrested, but admitted that it was still dark at that time. Williams testified that she had last seen defendant Price on the night before he was arrested, between eight and nine o'clock. He was in his bedroom with his girlfriend, Kenyatta Santiago. Williams could not say that he had not gone out afterward. She admitted that Price would go out at night without telling her, some nights staying out all night.

Charles Varnado, the father of Felicia Varnado, testified that David Honore telephoned him about 7:00 or 8:00 a.m. on the day of the shooting. This would have been after the shooting.

Lolita Rhea testified that she resided in New Orleans at 1820 N. Claiborne Avenue with her son Michael, who was about the same age as defendant Price. She said that the night before Price was arrested, he was at her home when she went to bed. Rhea stated that Price was also there when she woke up. She did not know if he had remained in the

residence after she went to bed.  Lolita Rhea subsequently said she was confused about when Price was at her home.  Price's uncle came to her home the morning Price was arrested.  He asked where Price was and was told he was in the back.  The uncle then walked to the back.

Michael Rhea testified that he had grown up in the same neighborhood as defendants Price and Honore, and knew them both.  He was with Price on the day before the murder, and said Price was in his presence from at least 12:00 a.m. until 5:00 a.m. on the day of the murder.  He drove to Price's home that night and honked his horn.  Price came out, got into his mother's Cadillac, and both drove separately back to Rhea's residence on N. Claiborne.  They went inside for a little while, left to drive around, and returned.  A friend, Michael Tenner, a shipyard welder who got off work at night, came to the Rhea residence after Michael Rhea's mother and sister were asleep.  Michael Rhea was asked what time Michael Tenner got off work, and he said about 1:00 a.m.  When asked what time Michael Tenner got to the Rhea residence, Michael Rhea said about midnight or 1:00 a.m.  Once Michael Tenner arrived, he and Michael Rhea and Price waited for some girls to telephone. The girls never called or showed up.  Price had to return his mother's car by 5:00 or 6:00 a.m. Michael Tenner followed Michael Rhea and Price to Price's residence between 4:00 and 5:00 a.m.  When they got to Price's Lizardi Street residence, Price went in the gate and gave the keys to his stepfather, and left with Tenner and Rhea.  Rhea did not see Price's stepfather or his mother.  The three drove back to Rhea's residence in Tenner's car.  They stayed there until

the morning. The first time they learned anything was wrong was when Kenny Cain, Price's uncle, came to the residence. Price remained at the residence until 11:30 p.m. or 12:00 a.m. that night. Before leaving, Rhea, Tenner and Price went to get some fried chicken at a Popeye's outlet four blocks away, and returned to eat it with Rhea's mother. At some point thereafter, Price left with his uncle. Rhea replied in the affirmative when asked whether his testimony was the truth.

Michael Rhea was asked on cross-examination whether anyone he knew had a shotgun or a pistol; he replied in the negative. Rhea said Kenyatta Santiago was the mother of Price's baby. He did not know the status of their relationship, but said she stayed with Price off and on. Rhea said he got to Price's residence at 8:00 or 9:00 p.m. on the night of November 10. After Price came out and got into his mother's Cadillac, they drove back to Rhea's home, arriving there at 10:00 or 11:00 p.m. They drove around looking for girls on the way back. Rhea said his mother was sleeping, but awoke and glanced up when Rhea and Price came in. He beeped Michael Tenner, who got there about 12:45 or 1:30 a.m. Rhea said he could not remember when they went to sleep, but said they woke up between 5:00 and 6:00 a.m. because Price had to take his mother's car home. Rhea did not know where defendant David Honore was that night.

Corey Washington, defendant Price's stepfather, testified that in November, 1999 he was living with Price and Price's mother at 708 Lizardi Street in New Orleans.

Washington was working long hours at the time for a construction company. On the morning Price was arrested, Washington opened the door to leave for work just as Price was coming inside. It was approximately 4:15 a.m. When Price saw Washington, Price gave him his mother's keys. Washington saw Michael Rhea and Price leave in Michael Tenner's car. Washington had seen Price at approximately 8:00 p.m. the night before. He did not know where Price had been between then and the time he saw him the next morning.

Washington said on cross-examination that he had not seen David Honore since June, 1999, and that to his knowledge Honore had been living in Tennessee with his sister. Washington stated that Michael Rhea was driving a white Chevrolet Camaro in November, 1999. Washington saw Kenyatta Santiago talking with Price in the Lizardi Street residence on the night before Price was arrested. Washington admitted two prior convictions, for simple burglary and theft, and said he was on parole until 2003.

Michael Tenner testified that defendant Price was his friend. He remembered the day Price was arrested. In November, 1999, Tenner was working at Halter Marine Shipyard from 4:30 p.m. until 1:00 a.m. Michael Rhea and Price paged him earlier on the night before Price was arrested, asking him to meet them at Rhea's home after he got off work. He went straight there after work to meet the two. They sat around and talked, waiting for some girls to come. The girls never came. Tenner said he was driving a black and white Camaro at that time. He later followed Price and Rhea to Price's home so Price could drop

off his mother's Cadillac. It was about 4:00 or 4:30 a.m. Price went inside for no more than a minute. Price did not change clothes while he was inside, and he was wearing the same clothes he had been wearing all night. They went back to Rhea's home. Later in the morning Price's uncle came to Rhea's house. Afterward, they bought some chicken and ate it at Rhea's home. Tenner answered in the negative when asked whether Price could have killed anyone at 3:00 a.m. that morning.

Tenner knew defendant David Honore, but did not see him or speak to him on the night in question. Defendant Price did not tell Tenner anything about Honore, i.e., that he had seen him or been with him earlier, or that he had talked to him. Tenner was not sure where Honore was residing at the time, but knew that he was out of town. Tenner had not seen Honore for approximately one year at that time.

Tenner said on cross examination that when he arrived at Michael Rhea's residence, Rhea's car was there, and so was Price's mother's Cadillac. Michael Rhea's mother was at home sleeping when the three were at Rhea's that night. Tenner answered in the negative when asked whether he knew of anyone who owned a gun. He did not see Corey Washington at Price's home when Price went to drop off his mother's car keys. He never saw an empty box of shotgun shells in front of Price's home the morning Price was arrested. Tenner said he went to work at 4:30 p.m. on the day Price was arrested, and that he had only slept about one and one half hours at Rhea's house.

Defendant Price testified that he graduated from high school and was working with his uncle's construction company at the time he was arrested. He had been undecided between entering the military and going to college. He knew Felicia Varnado from the neighborhood and through her relationship with David Honore. Price said he never had any problems with Felicia, but said she had the wrong person. Price said he had nothing to do with the shotgun shell box found in front of his residence on Lizardi Street. Price stated that on the night before the murder, his girlfriend (Kenyatta Santiago) came over with their child. Michael Rhea came over sometime after eight o'clock, and the two left, Price in his mother's Cadillac and Rhea in his car. After dropping off Rhea's car, the two rode around in the Cadillac. They ran across three females, and they talked of meeting later that night. Price and Rhea beeped Michael Tenner, who said he would come over after work. Rhea and Price subsequently went to Rhea's home, and Tenner came over. Price replied in the affirmative when asked whether he had seen Rhea's mother and Rhea's sister at Rhea's home. The three, Price, Rhea and Tenner, stayed at Rhea's home until they left to drive to Price's home so Price could drop off his mother's car and keys. Price said he saw Corey Washington in the front room of his home when he went to drop off the keys.

Price said he had a traffic court appearance on November 11, 1999 on a traffic citation. The citation was introduced in evidence. Price said he telephoned his home to ask Kenyatta Santiago to get some clothes ready for him to wear to court, and his uncle answered

the phone and told him police wanted to question him about a murder. His uncle said he would call Price's attorney, and Price waited at Rhea's home. He bought some fried chicken, which they all ate. He had a receipt for the chicken in his pocket when arrested, reflecting a purchase at 1:06 p.m. on November 11, 1999. The receipt was introduced in evidence. Price answered in the negative when asked whether he was involved in or had any information about the abduction and kidnapping of Felicia Varnado. Price answered in the negative when asked whether he knew the victim Rickey Thomas, or anything about his murder. Price said his nickname was "Tully."

Price said he had known defendant David Honore all of his life. He had not heard from Honore within the twenty-four hours prior to Price's surrender to police on November 11, 1999. He had last seen Honore, who was living in Tennessee with his family, when Honore came in town for a wedding in the summer of 1999. Honore did not have a car at that time. Price never saw Honore threaten any other man in the company of Felicia Varnado, even though Honore had seen her in the company of other men during the time Honore and Varnado were going out together.

Price listed Kenyatta Santiago as one of his alibi witnesses, the mother of one of his three children. Price did not work on the day before the murder, November 10. He left his home with Michael Rhea at 8:00 or 9:00 p.m., driving his mother's Cadillac. Price said he was wearing pajama bottoms and a T-shirt that night, what he said he usually wore. He

changed clothes the next day before going to see his attorney. Price was asked on cross examination why he dropped off his mother's car at 4:00 a.m. and returned to Michael Rhea's home instead of simply staying at home and going to sleep. He replied that he needed a ride to traffic court later that day, and that if he stayed at home he would have been stuck. He admitted that he did not have to be at court until 4:00 p.m., but said that he planned to go home later and get dressed for court. He did not change clothes when he returned his mother's Cadillac because Corey Washington was getting ready for work and everyone else was asleep.

## IV. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme

Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams[ v. Taylor*, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Hill*, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## V.  MERITS

### A.  Claim 1):  Insufficiency of Evidence

Petitioner complains that insufficient evidence was submitted to support his conviction due to the alleged weakness of Felicia Varnado's identification of him as one of the assailants. Petitioner complains that the State's case rested on nothing more than a 20-

year old's mistaken identification based upon no reliable facts. Petitioner asserts that Varnado never identified him "as being the man behind the mask," she "never saw any hair or facial features" of either of the alleged perpetrators. Instead, she simply "came to the conclusion that it must have been her ex-boyfriend that did the killing out of jealousy."[5]

When conducting a post-AEDPA sufficiency of the evidence review, a federal court may grant relief only if it determines that the state court decision rested on an "unreasonable application" of clearly established Federal law, as determined by the Supreme Court, to the facts of the case. *See* 28 U.S.C. § 2254 (d)(1). In its analysis of petitioner's insufficiency of evidence claim, the Louisiana Fourth Circuit Court of Appeal first set forth the applicable Supreme Court law, along with corresponding state law, stating:

> In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Green,* 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. *State v. Mussall,* 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. *Mussall; Green; supra.* "[A] reviewing court is not called upon to decide whether it

[5]Rec. doc. 1, pp. 5-6.

believes the witnesses or whether the conviction is contrary to the weight of the evidence." *State v. Smith,* 600 So.2d 1319 (La.1992) at 1324.

In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Shapiro,* 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from *Jackson v. Virginia, supra,* but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. *State v. Wright,* 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the *Jackson* reasonable doubt standard. [Citation omitted.]

*Price*, 842 So.2d at 505-506.

The court then examined the evidence submitted at trial regarding the identification of petitioner and co-defendant, Uralle Price, as the persons who shot and killed the victim, Rickey Thomas.

Although Varnado first told police that she did not know who killed the victim, she later positively identified Honore and his good friend Price from their physical characteristics. It was undisputed that Felicia Varnado and Honore had known each other for many years, and had dated each other for approximately six and one-half years, from the time she was thirteen until she was nineteen. It is undisputed that Varnado was well acquainted with Price-she said she had known him since he was six or seven. Thus, it is beyond dispute that Varnado was familiar with each defendant's physical characteristics. According to Varnado, Honore had threatened to kill her and Rickey Thomas, whom he knew she was dating. Honore was not happy she was dating Thomas. Also, according to Varnado, Price had told her that if Honore ever caught her with another man Honore would kill her and the man.

Two men who attempted to conceal their identities accosted Varnado outside her home. These two men obviously knew of Varnado's relationship

with the victim. They professed to want drugs and money from the victim, but one slapped away $600 in cash Felicia Varnado attempted to give him, although that money was not in the car when police discovered it later that day. There was not a scintilla of evidence to connect the victim or Varnado with drugs. One of the men, later identified by Varnado as Honore, accosted the victim, who fought back. Honore shot the man once with a handgun. Then the other man, later identified as Price, ran up the stairs with a shotgun and shot the victim. The victim was shot once more with the shotgun and three more times with a handgun. There was no evidence that the perpetrators entered the victim's apartment to search for drugs or money.

Felicia Varnado did not positively identify defendants when she gave her first statement to police. However, she mentioned that one might be "Tully," a friend of the other perpetrator. Tully is defendant Price, who is defendant Honore's friend. Varnado explained her failure to affirmatively identify defendants to Sgt. McNabb when giving that first statement by saying that she was afraid. Honore presented the testimony of his brother that he was in Tennessee working until 5:30 p.m. on the day before the early morning murder. Varnado even testified that Honore had been living in Tennessee at some point in 1999. No one placed Honore in New Orleans on the day of the murder, or the day before the murder, except Felicia Varnado. Two of Price's friends testified he was with them at the time of the murder, and immediately preceding and following it. Other testimony put Price at Michael Rhea's home hours after the murder. An empty shotgun shell box was found near Price's Lizardi Street residence. It was the same brand and type of shotgun shells as the shotgun shell found at the scene of the murder.

*Price*, 842 So.2d at 506-507.

Thereafter, the Louisiana Fourth Circuit concluded:

Viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found Felicia Varnado's testimony credible, rejected the alibi testimony of defense witnesses, resolved discrepancies in the testimony and evidence against defendants, and found beyond a reasonable doubt that David Honore shot the victim.

*Price*, 842 So.2d at 507.

This court finds that the above conclusion does not represent an unreasonable application of the law enunciated in *Jackson*, *supra*, to the facts of this case. Accordingly, petitioner's claim for habeas corpus relief is without merit.

## B. Claim 2): Trial Court Erred in Refusing to Admit into Evidence Felicia Varnado's Inconsistent Statements

Petitioner argues that the trial court erred in not admitting into evidence inconsistent statements which Felicia Varnado made to police. Petitioner submits that the trial court's error in this regard "prevented critical examination of Varnado's testimony by the jury."[6]

It is well established that federal habeas review is limited to questions of constitutional dimension. *See generally Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992), *cert. denied*, 508 U.S. 978, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993); *Castillo v. Johnson*, 141 F.3d 218, 222 and 224 (5th Cir.), *cert. denied*, 524 U.S. 979, 119 S.Ct. 28, 141 L.Ed.2d 788 (1998). In reviewing a state court evidentiary determination, such as the admission of a witness's prior, inconsistent statements, the federal habeas court's role "'is limited to determining whether a trial judge's error is so extreme that it constituted denial of fundamental fairness.'" *Andrade v. McCotter* 805 F.2d 1190, 1193 (5th Cir. 1986), *quoting Mattheson v. King,* 751 F.2d 1432, 1445 (5th Cir.1985).

---

[6]Rec. doc. 1, p. 7.

Petitioner raised the instant issue in connection with his direct appeal, arguing "that the trial court erred in failing to admit into evidence Felicia Varnado's complete statement dictated to police" and that the "error prevented critical examination of her testimony by the jury." *Price*, 842 So.2d at 511. The state appellate court, however, rejected petitioner's argument, finding that petitioner was not prejudice since Varnado never denied the alleged inconsistencies. *Id.*

As noted above, a state court's factual finding, in this case, the finding that Varnado did not deny any inconsistencies in prior police statements, is presumed correct.[7] Accordingly, petitioner clearly was not unduly prejudiced by the fact that the alleged inconsistencies were not admitted at trial. As such, the instant claim for habeas corpus relief is without merit.

### C. Claim 3): Trial Court Erred in Providing "Incomplete Re-Instruction" to Jury Regarding Reasonable Doubt

At petitioner's trial, the jury, during its deliberations, "submitted a request to the court seeking a written explanation of reasonable doubt, and asking 'what doubt is reasonable.'" *Price*, 842 So.2d at 511.[8] In response, the court advised:

---

[7]*See* discussion *supra* at pp. 27-28.

[8]*See also* Rec. doc. 8, p. 126, lines 23-26. The State, in connection with Mr. Honore's habeas corpus petition, did not supply the court with a copy of the state trial transcript. Accordingly, the court, for purposes of adjudicating this matter, reviewed the state trial transcript which accompanied the habeas petition, Civil Action No. 06-2444 "I"(6), submitted by Honore's co-defendant, Uralle Price. The court has copied and made a part of the federal record (doc. 8) the portions of the state trial transcript to which the court makes reference in the instant Report and

I can't answer questions for you. The only thing I can do is reread my jury charge to you concerning the reasonable doubt standard. I'll reread this. While the State must prove guilt beyond a reasonable doubt it does not have to prove guilt beyond all possible doubt. Reasonable doubt is doubt based upon reason and common sense and is present when after you have carefully considered all the evidence, you cannot say your [sic] firmly convinced of the truth of the charge. That is the reasonable doubt standard. If that answers your question, you can return to deliberate. If you need further clarifications, you can consult with each other.[9]

In its original charge to the jury, the court advised:

The defendant is presumed to be innocent until each element of the crime necessary to constitute his guilt is proven beyond a reasonable doubt. The defendant is not required to prove his innocence. Thus the defendant begins the trial with a clean slate. The burden is upon the State to prove the defendant's guilt beyond a reasonable doubt. In considering the evidence, you must give the defendants the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence. If you're not convinced of the guilt of the defendants beyond a reasonable doubt, you must find them not guilty. While the State must prove guilt beyond a reasonable doubt, it does not have to prove guilt beyond all possible doubt. Reasonable doubt is doubt based on reasonable common sense, and is present when, after you have carefully considered all the evidence, you cannot say you are firmly convinced of the truth of the charge.[10]

The above charge is in accordance with La.C.Cr.P. art. 804(A) which provides:

In all cases the court shall charge the jury that:

---

Recommendation. Further, the court has ordered (doc. 9) the District Attorney for the Parish of St. Bernard Parish to submit a complete copy of the state court record associated with Mr. Honore's state court proceedings so that future reviewing courts will not be confronted with the cumbersome task of having to obtain co-defendant Price's state court record in order to properly review petitioner Honore's federal habeas corpus claims.

[9]*See* Rec. doc. 8, p. 127, lines 1-17.

[10]*See* Rec. doc. 8, p. 109, lines 3-25.

(1) A person accused of crime is presumed by law to be innocent until each element of the crime, necessary to constitute his guilt, is proven beyond a reasonable doubt;

(2) It is the duty of the jury, in considering the evidence and in applying to that evidence the law as given by the court, to give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence in the case; and

(3) It is the duty of the jury if not convinced of the guilt of a defendant beyond a reasonable doubt, to find him not guilty.

The court may, but is not required to, define "the presumption of innocence" or "reasonable doubt" or give any other or further charge upon the same than that contained in this article.

Petitioner argues that the trial court erred in failing, in response to the jury's inquiry regarding the meaning of "reasonable doubt", to reiterate its entire original charge provided to jurors in accordance with the provisions of La.C.Cr.P. art. 804(A). The trial judge, however, explained, that the other portions of his original charge involved "presumption of innocence" and "burden of proof", two subjects about which the jury did not make further inquiry.[11] The court further advised that if he reread to jurors those unrelated "portions of the charge", "beyond what [the jury] asked for," "I would then become pro active in determining what I think they should like to hear again."[12]

In addressing this issue in connection with petitioner's direct appeal, the Louisiana Fourth Circuit reasoned:

[I]t is not error where a trial court declines to give an additional instruction as to a matter outside the scope of the jury's request for additional instructions.

---

[11]*See* Rec. doc. 8, p. 130, lines 10-26.

[12]*See* Rec. doc. 8, p. 131, lines 5-13.

*See State v. Jenkins,* 98-1603 (La.App. 4 Cir. 12/29/99), 750 So.2d 366. In *Jenkins,* the defendant was being tried for first-degree murder, which allegedly occurred during the perpetration of an armed robbery. Defendant maintained that he acted in self-defense when the victim attempted to force him to engage in homosexual relations. Two hours into deliberations, the jury sought additional instructions on the law of first-degree murder, second degree murder, manslaughter, and justifiable homicide. On appeal, the defendant argued that the trial court erred in failing to reinstruct the jury concerning his homosexual rape self-defense theory. This court found no error in the court's failure to give such a reinstruction because the jury did not request it, and the trial court had already given a charge on the definition of a rape as a violent and forcible felony when it initially instructed the jury. *Jenkins,* p. 23-26, 750 So.2d at 379-380. The instant case is analogous to *Jenkins.* The jury requested only an instruction as to the definition of reasonable doubt, not the presumption of innocence. These are two different matters, as evidenced by La.C.Cr.P. art. 804(A), which explicitly states that the court may but is not required to define "the presumption of innocence" or "reasonable doubt." The jury requested a reinstruction on one of those two definitions, not both, and it cannot be said that the trial court erred in declining to give a reinstruction not requested by the jury.

*Price*, 824 So.2d at 512-513.

It is well-established that federal courts possess only limited authority to consider state evidentiary determinations in a state prisoner's habeas proceeding. *Burgett v. Texas*, 389 U.S. 109, 113-14, 88 S.Ct. 258, 260-61, 19 L.Ed.2d 319 (1967). As long as an evidentiary ruling, such as what instruction should be provided in response to a jury's inquiry, is in accordance with state law and infringes no right protected under the Constitution, habeas relief is not warranted. *Id. See also Robinson v. Whitley*, 2 F.3d 562, 566 (5th Cir. 1993), *cert. denied*, 510 U.S. 1167, 114 S.Ct. 1197, 127 L.Ed.2d 546 (1994). *See also Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)

(allegedly deficient jury instruction can serve as a basis for federal habeas corpus relief only if the deficient instruction "by itself so infected the entire trial that the resulting conviction violates due process."); *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974) (quotation omitted) ("[I]t must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.").

Based upon the above reasoning on the part of the Louisiana Fourth Circuit Court of Appeal, it is clear that the trial court, by virtue of its decision to reinstruct jurors only with respect to their specific question regarding the meaning of "reasonable doubt", acted in accordance with applicable state law. Nor was the court's decision in this regard violative of any constitutional right. Accordingly, petitioner's claim for habeas corpus relief is without merit.

### D. Claim 4): Trial Court Erred in Admitting Evidence of Petitioner's Character and Alleged Suicide Attempts Without Conducting a Pre-Trial Hearing

Petitioner argues that the trial court violated state law in not conducting a pre-trial hearing with respect to the admissibility of evidence regarding the petitioner's character and alleged suicide attempts. However, as noted earlier, federal habeas review is limited to questions of constitutional dimension. *See generally Jernigan*, 980 F.2d at 298. The fact that the trial court, in failing to conduct a pre-trial evidentiary hearing, was not acting in

accordance with state law, is not relevant for purposes of determining petitioner's entitlement to federal habeas corpus relief. Further, as the Louisiana Fourth Circuit noted in addressing the instant issue in connection with petitioner's direct appeal, petitioner has failed "to show how he was prejudiced" by virtue of the introduction of evidence reflecting his less than stable background. Any error on the part of the trial court "was harmless error." *Price*, 842 So.2d at 508.

This court agrees with the state court's assessment that petitioner was not prejudiced by the trial court's alleged erroneous admission of evidence regarding petitioner's character and suicide attempts. The evidence against petitioner was significant. As previously discussed, Varnado knew petitioner well, having dated him for six and a half years.[13] Varnado was positive in her ultimate identification of petitioner as one of the men who shot and killed the victim. Petitioner suffered no due process violation as a result of the trial court's alleged erroneous evidentiary ruling and, as such, is not entitled to habeas corpus relief.

### E. Claim 5): State Failed to Disclose that Tests Revealed No Matching Fingerprints and Trial Court Failed to Grant New Trial Based Upon State's Failure to Disclose This Favorable Evidence

Petitioner argues that his constitutional rights were violated when the State failed to disclose, prior to trial, that its testing revealed no fingerprints which matched either

---

[13]*See supra* at p. 30.

of the defendant's fingerprints and the trial court erred in failing to grant a new trial based

upon the State's failure to timely disclose this favorable evidence. As the state appellate

court explained:

> [I]t was discovered that Felicia Varnado's vehicle had been processed for
> fingerprints during direct and cross-examination of Dave Levy, of the
> Jefferson Parish Sheriff's Office, and St. Bernard Parish Sheriff's Office
> Detective Graf. Levy assisted Det. Graf with the processing of the interior of
> Varnado's vehicle for fingerprints. Levy testified that there may have been
> some non-identifiable fingerprints or smudges, but he understood that there
> were no positive matches to either of the defendants. Det. Graf replied in the
> negative when asked on direct examination whether he found any fingerprint
> evidence on the inside of the vehicle, even a partial print or Felicia Varnado's
> fingerprints. Det. Graf confirmed this on cross-examination. He also
> confirmed that he dusted the exterior for fingerprints but again found none, not
> even a partial print. A cigarette pack and a shotgun shell casing were also
> checked for prints, but none were found.

*Price*, 842 So.2d at 509.

In addressing petitioner's claim that the State unconstitutionally failed to

disclose, prior to trial, the fact that investigators found no match for his fingerprints, the

Louisiana Fourth Circuit examined the applicable law:

> In *State v. Lindsey,* 98-1064 (La.App. 4 Cir. 6/3/98), 715 So.2d 544,
> this court set forth the applicable law pertaining to the State's disclosure of
> exculpatory evidence, or *Brady* material, as follows:

>> The due process clause of the Fourteenth Amendment to the United
>> States Constitution requires the disclosure upon request of evidence
>> which is favorable to the accused when the evidence is material to guilt
>> or punishment. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10
>> L.Ed.2d 215 (1963). This rule has been expanded to include evidence

which impeaches the testimony of a witness where the reliability or credibility of the witness may be determinative of guilt or innocence. *Giglio v. U.S.,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The *Brady* rule is based on due process of law. "[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial, that is, evidence favorable to the defendant which is material to guilt or punishment." *State v. Rosiere,* 488 So.2d 965, 970 (La.1986). The test for determining materiality was first established in *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). However, in *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Supreme Court recently outlined the considerations for determining whether allegedly-suppressed evidence is material. These considerations were summarized in a recent decision by the Louisiana Supreme Court, *State v. Marshall,* 94-0461 (La.9/5/95), 660 So.2d 819:

> The issue is whether the exculpatory evidence is material under the *Brady-Bagley-Kyles* line of cases. Evidence is material only if it is reasonably probable that the result of the proceeding would have been different had the evidence been disclosed to the defense. A reasonable probability is one which is sufficient to undermine confidence in the outcome. [*United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)]. [The reviewing court] must provide a cumulative evaluation of the suppressed evidence, keeping in mind that [the defendant] does not have to show that, with the addition of the suppressed evidence, his trial would have resulted in acquittal or that there would be an insufficiency of the evidence to support a conviction. [The defendant] need only show that "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." *Kyles,* 115 S.Ct. at 1569.

In *State v. Cook,* 535 So.2d 988 (La.App. 4 Cir.1988), the defendant, convicted of four counts of armed robbery, appealed citing an alleged *Brady* violation. He claimed that the State failed to disclose evidence that police found fingerprints on the getaway vehicle allegedly used by him and two

others that did not match his prints. This court noted that such evidence may be material to a defendant's guilt. However, this court held that, as the evidence had been given to the jury during trial, the defendant received any exculpatory benefit of that evidence. Accordingly, this court found that the case involved "a matter of late disclosure of evidence instead of a *Brady* question of suppression of favorable evidence." 535 So.2d at 990. The defendant argued that he was prejudiced because had he known of the evidence he might have chosen to subpoena one of his alleged accomplices, who had pleaded guilty, to testify at his trial. This court rejected that argument, finding that the late disclosure of the fingerprint evidence did not prejudice the defendant or deny his right to a fair trial.

In *State v. Taylor,* 422 So.2d 109 (La.1982), the defendant was found guilty of first degree murder and sentenced to death. The defendant appealed alleging a *Brady* violation because the State destroyed some fingerprints lifted from the victim's car. Testimony established that the prints were discarded/destroyed because they did not contain enough points for identification. One of three good fingerprints recovered matched the defendant. Noting that all fingerprints suitable for identification had been turned over to the defendant, the court found no *Brady* violation, stating: "The fingerprint technician merely threw away prints which were of no value, either as exculpatory or inculpatory evidence, because they contained insufficient points for identification purposes."

*Price*, 842 So.2d at 509-510 (citations omitted).

Applying the above law to the pertinent facts, the court reasoned:

In the instant case, as in *Cook* and *Taylor,* there was no *Brady* violation. As in *Cook,* the case is one of late disclosure of evidence. Defendant Price attempted to call Dave Levy and Det. Graf at the motion for new trial, apparently to determine whether in fact no fingerprints were recovered from Felicia Varnado's vehicle; only partial prints not suitable for identification; or full prints that did not match defendants or any other known person. The record of the hearing on the motion for new trial reflects that Dave Levy and Det. Graf were both present at the hearing. The trial court refused to permit them to testify.

As noted, Det. Graf testified at trial that no fingerprints, even partial ones, were recovered from the car. Dave Levy recalled that there might have been some "non-identifiable" prints or "smudges" found. Thus, there is a discrepancy. However, even assuming Dave Levy's testimony was correct, his use of the terms "non-identifiable" and "smudges" could mean prints not suitable for identification purposes, as in *Taylor*. Further, this discrepancy was brought out during the trial, during cross examination; defense counsel had an opportunity to resolve it then with minimal further questioning, but failed to do so. Finally, it can be noted that the late-disclosed evidence in *Cook* consisted of fingerprints suitable for identification that simply did not match those of the defendant. Even assuming fingerprints suitable for identification were found on Felicia Varnado's vehicle, there is no suggestion that they were matched to anyone else, and thus the instant case is analogous to *Cook*. Therefore, even if fingerprints suitable for identification were found, the instant case demands the same result as in *Cook*.

Defendants fail to allege any specific prejudice, but simply make a conclusory allegation that the belated disclosure prevented them from "preparing and using the evidence effectively." Under these circumstances, the trial court did not err in denying defendant's motion for new trial based on the late disclosure of this evidence. It cannot be said that defendants were denied their right to a fair trial due the late disclosure of this evidence.

*Price*, 842 So.2d at 510-511.

This court finds that the above reasoning on the part of the state appellate court does not represent an unreasonable application of Supreme Court law to the facts of this case. Accordingly, petitioner's claim for habeas corpus relief is without merit.

### F.  Claim 6):  Ineffective Assistance of Counsel

Petitioner contends that counsel was unconstitutionally ineffective by failing "to object and request a mistrial during [his] trial proceedings." Specifically, petitioner argues that counsel was ineffective by failing to object to the following:

1) The prosecutor's improper religious reference during opening remarks, comparing petitioner to Cain who, in the Bible, killed Able:

> Maybe I should begin really a long, long time ago, a time when there were few people in the world, and I want to take you back in the Book of Genesis when Cain killed Able, the first murder.... Genesis says when God looked for Able, there was like a call that your brother's blood cries out from the ground. God didn't kill Cain. He caused him to suffer for the rest of his time on earth by soiling the ground, where things that he planted wouldn't grow. He had hard labor for the rest of his life.[14]

2) The prosecutor's improper comment, during opening remarks, upon "defendant's retention of counsel" and "defendant's post arrest silence"[15]:

> Mr. Price surrenders himself to the St. Bernard Parish Jail accompanied by a letter from [counsel] that he has a lawyer, and don't talk to him; don't ask him anything, which is his right.[16]

3) The trial court's discussion of and ruling upon "the admissibility of evidence in the presence of the jury."[17]

4) The prosecutor's improper "smear" of petitioner's alibi witnesses during opening remarks.[18]

> I understand that there is a defense of alibi. I don't know what that defense is. We were given a list of people. One of the people on the list has a name of Kenny Cain. If Mr. Kenny Cain testifies, I want you to please place [sic] close attention to Kenny Cain. I want you to look at him real good. He's the one that surrendered his nephew Tully Price, and I'm going to ask

---

[14] *See* Rec. doc. 8, p. 5, lines 21-26; p. 6, lines 9-17.

[15] Rec. doc. 1, p. 22.

[16] *See* Rec. doc. 8, p. 11, lines 17-22.

[17] Rec. doc. 1, p. 22.

[18] Rec. doc. 1, p. 22.

you if these alibi witnesses testify, I'm going to suggest to you
that they're lying to you....[19]

5) The prosecutor's improper comments, during opening remarks, regarding
the victim's character, thereby "inflam[ing] the jury's sympathy for the
deceased."[20]

On November 11, 1999, there was a brutal murder of a fine
person by the name of Rickey Thomas. Rickey was 26 years
old. His father is here in the court. Rickey was a military
person. He was a postal employee, never any problems, a fine
young man, hard working, good natured, never hurt anyone....[21]

6) The prosecutor's improper "interject[ion]", during opening remarks, of
"knowledge outside of his expertise concerning weapons."[22]

The shotgun has a paper wad that pushes the bullets through,
and those wads are identified by the gauge of the shotgun, 12-
gauge, 20-gauge, 410; there are different size wads.[23]

The seminal Supreme Court decision regarding ineffective assistance of
counsel is *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d
674 (1984), wherein the Court held that in order to prove that counsel was unconstitutionally
ineffective, petitioner must demonstrate that counsel's performance was deficient and that the
deficient performance prejudiced the defense. If a court finds that petitioner has made an
insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim
without addressing the other prong.

---

[19]*See* Rec. doc. 8, p. 34, lines 4-17.

[20]Rec. doc. 1, p. 22.

[21]*See* Rec. doc. 8, p. 6, lines 18-26.

[22]Rec. doc. 1, p. 22.

[23]*See* Rec. doc. 8, p. 10, lines 24-29.

Under the deficient performance prong of the *Strickland* test, "it is necessary to 'judge...counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed. 2d 180 (1993), *citing Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066.  To prove prejudice under the *Strickland* standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

Petitioner has failed to satisfy the deficiency prong with regard to arguments 1) and 2) since a review of the trial transcript reflects that objections were raised by counsel in response to the prosecutor's Biblical reference and reference to "defendant's retention of counsel" and "defendant's post arrest silence".[24]  Similarly, petitioner cannot meet his burden of proof with respect to argument 3), his claim that counsel was ineffective in "allow[ing] the trial court to discuss and rule on the admissibility of evidence in the presence of the jury."[25]  Petitioner does not delineate what ruling or rulings were allegedly discussed in the presence of the jury.  The only pertinent colloquy cited by petitioner reflects the opposite to be true, that counsel was careful to ensure that arguments supporting his objection and motion for a mistrial were not made within earshot of the jury.[26]

---

[24]*See* Rec. doc. 8, p. 5, lines 27-32; p. 6, lines 1-7; p. 11, lines 23-28.

[25]Rec. doc. 1, p. 22.

[26]Rec. doc. 1, pp. 17-18; Rec. doc. 8, pp. 11-31.

Petitioner has likewise failed to satisfy his burden of proof with regard to arguments 4) and 5). The prosecutor's comments were made during opening remarks. Jurors were advised by both the court and the prosecutor that the opening remarks of counsel do not constitute evidence in the case, but merely reflect the attorney's statement as to what the evidence will reflect.[27] Defense counsel had no legitimate basis to object to such remarks during opening statement.

Finally, with respect to the prosecutor's opening comment regarding the paper wading associated with different gauge shotguns, petitioner has failed to demonstrate how he was prejudiced by this alleged weaponry expertise outside the prosecutor's knowledge. The prosecuting attorney was, once again, providing a statement with respect to testimony that would be provided by Dr. Paul McGarry in connection with the State's case against defendants.[28] As set forth above, counsel, during opening statement, are allowed to state what they believe the upcoming evidence will reflect. There was no legitimate basis for defense counsel to object to the prosecutor's remark in this regard.

### G. Claim 7): Prosecutorial Misconduct

Petitioner argues that his constitutional rights were violated by virtue of the prosecutor's improper comments during the State's opening argument. Specifically, petitioner complains about: 1) "prejudicial comments concerning religion;" 2) "prejudicial

---

[27]Rec. doc. 8, p. 3, lines 4-15; p. 5, lines 3-19.

[28]*See Price*, 842 So.2d at 499.

comments concerning credibility of defense witnesses;" 3) "impermissible comments on retention of counsel and post-arrest silence;" 4) "impermissible vouching for deceased victim;" and, 5) "improper comments on matters requiring expert knowledge."[29]

Federal habeas review of a state prosecutor's opening and/or closing arguments is restricted to a determination of whether the prosecutor's comments "so infected the trial with unfairness as to deprive the defendant of due process. The petitioner bears the burden of showing either that the prosecutor persistently exhibited pronounced misconduct or that the trial evidence was so insubstantial that, without the prosecutor's improper comments, the verdict would have been different." *Pena v. Scott*, 1994 WL 486961, 5 (5th Cir. 1994) (citing *Edwards v. Scroggy,* 849 F.2d 204, 210 (5th Cir.1988), *cert. denied*, 489 U.S. 1059, 109 S.Ct. 1328, 103 L.Ed.2d 597 (1989)).

Given the significant evidence against petitioner, the court finds that the prosecutor's comments did not deprive petitioner of due process. As the Louisiana Fourth Circuit noted, Felicia Varnado knew petitioner well. She had dated petitioner for six and a half years.[30] Her initial hesitancy in identifying petitioner as one of the persons who had shot and killed the victim was not due to the fact that she was not sure it was petitioner, but rather, because she was afraid. Based upon the above, the court finds that the prosecutor's

---

[29]*See* discussion *supra* at pp. 42-43 for details regarding prosecutor's alleged prejudicial remarks during opening arguments.

[30]*See* discussion *supra* at p. 30.

comments did not constitute a violation of petitioner's right to due process and, as such, petitioner is not entitled to habeas corpus relief.

Accordingly;

## **RECOMMENDATION**

It is hereby **RECOMMENDED** that the petition of David Honore for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** with prejudice.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Services Auto. Ass'n*, 79 F. 3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this 24th day of _____April_____, 2009.


LOUIS MOORE, JR.
UNITED STATES MAGISTRATE JUDGE